FILED
CHARLOTTE, NC

MAY 2 2 2025

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:25cr128-MOC |
| | ) | |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| JON PATRICK KUBLER | ) | 15 U.S.C. §§ 78j(b), 78ff |
| | ) | 17 C.F.R. § 240.10b-5 |
| | ) | 18 U.S.C. § 1957 |
| | ) | |

**THE GRAND JURY CHARGES:**

At the specified times and at all relevant times:

**Introductory Allegations**

1.      From in or around December 2017 through at least April 2023, the defendant, JON PATRICK KUBLER, defrauded approximately 30 investors located in the Western District of North Carolina and elsewhere out of more than $4 million through an investment fraud scheme. Throughout the scheme, KUBLER made false and fraudulent representations, concealed and omitted material facts, told deceptive half-truths, and used investor money to make Ponzi-style payments to previous investors and to pay personal expenses.

2.      Despite not being licensed as an investment adviser, KUBLER provided investment planning and management services to victims who were unsophisticated investors, elderly, and the beneficiaries of settlements or life insurance proceeds. KUBLER relied on and abused his position of trust to misappropriate victim funds.

**Background**

3.      KUBLER was a resident of Redondo Beach, California and provided financial consulting and management services to individuals. KUBLER owned and operated businesses including Kubler Consulting, LLC ("Kubler Consulting") and Kubler Financial, Inc. ("Kubler Financial"), neither of which were registered with the Securities and Exchange Commission ("SEC") or the State of North Carolina to sell securities.

4.      Aksarben Evolution, LLC ("Aksarben Evolution") was a Nebraska limited liability company that KUBLER formed in 2009 to invest in commercial real estate in Aksarben Village, an entertainment and shopping center in Omaha, Nebraska. KUBLER controlled Aksarben Evolution. Kubler Consulting was the sole managing member of Aksarben Evolution, and KUBLER was Aksarben Evolution's registered agent.

1

5.      Green Saddle, LLC ("Green Saddle") was a Nebraska limited liability company formed in 2014 that KUBLER controlled. KUBLER was the managing member and registered agent of Green Saddle.

6.      Zone 5 Entertainment, LLC ("Zone 5 Entertainment") was a Nebraska limited liability company formed in 2009, which developed and operated real estate in Aksarben Village. At various points in time, Aksarben Evolution and Green Saddle owned stakes in Zone 5 Entertainment.

7.      D.M. was a resident of Charlotte, North Carolina, and the owner of Company 1. D.M. was a client of and had assets managed by KUBLER.

## The Securities Fraud Scheme

### *Aksarben Evolution*

8.      Between approximately 2009 and approximately 2012, KUBLER offered and sold membership interests in Aksarben Evolution. During this time frame, KUBLER, on behalf of Aksarben Evolution, raised approximately $7 million from approximately 130 investors.

9.      By the end of 2013, Aksarben Evolution only had one remaining asset: a 50% ownership interest in Zone 5 Entertainment.

10.      Beginning in 2016, Aksarben Evolution began selling its equity interest in Zone 5 Entertainment. In March 2019, Aksarben Evolution transferred its final 10% ownership interest in Zone 5 Entertainment to Green Saddle, thereby disposing of all of its equity in Zone 5 Entertainment. Green Saddle did not pay Aksarben Evolution for the Zone 5 Entertainment ownership interest.

11.      After the asset transfer to Green Saddle, Aksarben Evolution no longer owned any meaningful investments or business assets and produced no income. As of March 2019, however, Aksarben Evolution still had approximately 120 investors who were owed more than $1 million.

12.      From approximately April 2019 through approximately October 2021, KUBLER sold Aksarben Evolution securities to approximately 13 investors, raising approximately $2 million.

13.      In or around November 2021, KUBLER sent Aksarben Evolution investors a materially misleading letter (the "Option Letter") that stated, among other things, that Aksarben Evolution was being terminated "due to a multitude of factors and that the original purpose of the company being no longer viable to continue." In the Option Letter, KUBLER provided investors with a choice to redeem their interest in Aksarben Evolution in exchange for either: (i) a promissory note to be paid off in no more than three years; or (ii) Green Saddle securities.

14.      KUBLER's statements in the Option Letter omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including that:

2

a.    Per the terms of the Aksarben Evolution Operating Agreement, Aksarben Evolution should have dissolved no later than March 2019, following the sale of its final asset, Zone 5 Entertainment;

b.    Aksarben Evolution had no meaningful assets;

c.    The investors' current equity in Aksarben Evolution had no value;

d.    Future payments would come from other investors, not Green Saddle's assets or investments;

e.    Green Saddle was not using the money it raised to make investments; and

f.    Green Saddle lacked sufficient assets to satisfy its obligations to the investors who selected equity options in Green Saddle.

## Green Saddle

15.    KUBLER formed Green Saddle in or around January 2014. Green Saddle did not engage in any business operations before 2017 and did not file a tax return until 2021.

16.    Green Saddle had no assets or investments until March 2019, when it acquired Aksarben Evolution's remaining 10% interest in Zone 5 Entertainment.

17.    As of December 2021, Green Saddle valued its 10% ownership interest in Zone 5 Entertainment at approximately $209,000.

18.    From approximately December 2017 to approximately April 2023, KUBLER sold Green Saddle securities to approximately 30 investors, raising approximately $2.5 million. Some of these investors also owned investments in Aksarben Evolution.

19.    From approximately December 2017 to approximately March 2019, before Green Saddle had any assets, KUBLER sold approximately $1.3 million in Green Saddle securities to approximately 16 investors.

## The Scheme

20.    From in or around December 2017 through at least April 2023, KUBLER raised more than $4 million from approximately 30 investors located in the Western District of North Carolina and elsewhere for investments in Aksarben Evolution and Green Saddle by making materially false and fraudulent representations, concealing material facts, and telling materially deceptive half-truths, to include:

a.    KUBLER fraudulently represented that investments in Aksarben Evolution and Green Saddle were good, sound investments primarily in commercial real estate. KUBLER did not disclose that new investments would not be invested in real estate but rather that the majority of the investments would be used to make Ponzi-style payments.

3

b.      KUBLER fraudulently represented that Green Saddle was an investment in commercial real estate that was different from Aksarben Evolution. In truth and in fact, however, KUBLER had transferred Aksarben Evolution's ownership in Zone 5 Entertainment to Green Saddle, and Green Saddle did not invest in any new real estate.

c.      KUBLER did not disclose that Aksarben Evolution and Green Saddle lacked sufficient tangible assets and income to satisfy its obligations to investors.

d.      KUBLER fraudulently represented to investors that he would use their funds to generate profits and that he would distribute the returns of capital or profits on a pro rata basis. In reality, the funds were not used to generate profits and were instead used to make Ponzi-style payments to continue the scheme.

e.      KUBLER did not disclose that new investments would be used to pay KUBLER's personal expenses, make cash withdrawals, and fund transfers to his personal bank account and the bank accounts of other entities owned or managed by KUBLER.

f.      KUBLER fraudulently provided investors with balance sheets that reflected fictitious valuations of their investments in Aksarben Evolution and Green Saddle.

g.      KUBLER did not disclose that, by no later than November 2021, he was the subject of an ongoing investigation by the SEC, of which he was aware, and he misled at least one investor about the purpose of a SEC inquiry and instructed the investor not to respond to the inquiry.

21.      In most cases, prior to receiving the investor deposits, the bank accounts that KUBLER managed and controlled had very low or even negative account balances. Therefore, in these circumstances, payments to the prior investors could not have been made but for the new investor money, as the underlying values of the assets were inadequate and the profits generated were insufficient to pay off the prior investors.

22.      Kubler's Ponzi-style scheme created the false appearance that investor money was being used to invest in real investments or assets that generated profits. In some instances, investors invested additional money after having received Ponzi-style payments.

23.      KUBLER also abused his role as an investment adviser for his clients in order to obtain access to victims' financial and investment accounts and misappropriate victim funds through various fraudulent means, including through executing fraudulent transactions without the victims' knowledge or consent.

## Examples of Investor Transactions

### Investor R.G.

24.      In or around December 2019, KUBLER solicited R.G. for an investment opportunity with Aksarben Evolution. On or about December 10, 2019, R.G. gave KUBLER a $275,000 check representing her investment in Aksarben Evolution. On or about December 10,

4

2019, KUBLER deposited the check into Aksarben Evolution Bank Account #3741, which had a balance of $2.90 prior to the deposit.

25.     On or about January 24, 2020, KUBLER had R.G. execute a Subscription Agreement for Aksarben Evolution. The Subscription Agreement acknowledged that R.G. had reviewed the Aksarben Evolution Operating Agreement and Private Placement Memorandum, both of which set forth that Aksarben Evolution was organized for the purpose of making investments in commercial real estate through Zone 5 Entertainment. However, at the time of R.G.'s execution of the Subscription Agreement, Aksarben Evolution no longer owned any interest in Zone 5 Entertainment and did not have any other meaningful assets.

26.     KUBLER did not invest R.G.'s funds as represented. Instead, KUBLER used the funds to repay other investors and fund his personal lifestyle. For example:

     a.     On or about December 12, 2019, KUBLER transferred $10,037.67 to M.H., another Aksarben Evolution investor.

     b.     On or about December 16, 2019, KUBLER transferred $60,140.67 to K.O., another Aksarben Evolution investor.

     c.     On or about December 17, 2019, KUBLER used $5,131.03 to pay rent for KUBLER's office space in Omaha, Nebraska.

     d.     Between December 12, 2019 and December 17, 2019, KUBLER made multiple cash withdrawals totaling $943 at various ATMs located in California.

     e.     On or about December 17, 2019, KUBLER transferred $70,000 to an account managed by M.R., another Aksarben Evolution investor.

*Investor C.V.*

27.     In or around December 2021, KUBLER solicited C.V. for a purported new real estate investment with Green Saddle. KUBLER sold C.V. a 2.96% membership interest in Green Saddle in exchange for a $385,000 investment, thereby valuing Green Saddle at over $13,000,000. KUBLER did not disclose to C.V. that Green Saddle's only income-generating asset was a 10% ownership interest in Zone 5 Entertainment, which Green Saddle valued at approximately $209,000 as of December 2021.

28.     On or about December 22, 2021, C.V. mailed KUBLER a $385,000 check, which represented C.V.'s investment in Green Saddle. On or about January 4, 2022, KUBLER deposited the check into Green Saddle Bank Account #9415, which had a balance of negative $49.00 prior to the deposit.

29.     On or about December 31, 2021, KUBLER and C.V. agreed to and signed the Green Saddle Operating Agreement, which set forth the terms of C.V.'s investment. The Green Saddle Operating Agreement set forth, among other terms, that Green Saddle would make pro rata distributions and KUBLER would not take any compensation for his management of Green Saddle. KUBLER also represented that C.V.'s funds would be used to invest in Green Saddle.

30.    KUBLER did not invest C.V.'s funds in Green Saddle as represented. Instead, KUBLER used the funds to repay other investors and fund his personal lifestyle. For example:

    a.    On or about January 11, 2022, KUBLER transferred $347,269.87 to pay off R.G., another investor in Aksarben Evolution who had requested the return of her funds.

    b.    Between on or about January 11, 2022 and on or about January 14, 2022, KUBLER transferred $33,500 to Kubler Financial Bank Account #5574.

    c.    On or about January 24, 2022, KUBLER transferred $1,500 to his personal account, Kubler Bank Account #8363.

31.    In or around September 2022, C.V. received a letter from the SEC regarding its investigation into alleged securities fraud by KUBLER. In an effort to conceal the scheme, KUBLER misled C.V. by telling her that she did not need to respond to the SEC and that it was normal to receive a letter from the SEC after receiving a large settlement as C.V. had from a third party.

### *Investor W.T.*

32.    In or around February 2021, KUBLER solicited W.T. for an investment opportunity related to Aksarben Evolution. On or about February 1, 2021, KUBLER and W.T. signed an agreement in which W.T. agreed to purchase 71.428% of Aksarben Evolution's purported interest in Zone 5 Entertainment, which KUBLER represented would result in W.T. having a 5% ownership share of Zone 5 Entertainment. In truth and in fact, however, Aksarben Evolution had no assets since March 2019 and did not own any interest in Zone 5 Entertainment at the time of the execution of the agreement, and KUBLER dramatically overstated the value of any such interest.

33.    On or about February 4, 2021, W.T. transferred $500,000, representing a portion of her investment, to Aksarben Evolution Bank Account #7412, which had a balance of $734.44 before the deposit. KUBLER used W.T.'s funds to repay other investors in entities KUBLER controlled. For example:

    a.    On or about February 5, 2021, KUBLER transferred $2,750 to M.R., another Aksarben Evolution investor.

    b.    Between on or about February 5, 2021 and on or about February 8, 2021, KUBLER transferred $40,000 to accounts in the name of a business owned by D.M., another Aksarben Evolution investor, but under KUBLER's control.

    c.    On or about February 5, 2021 and on or about February 16, 2021, KUBLER transferred $8,000 and $8,750, respectively to AV Bhill, LLC, an entity that KUBLER managed and solely controlled.

    d.    Between on or about February 5, 2021 and on or about February 19, 2021, KUBLER transferred $19,750 to Kubler Financial.

6

34.     On or about April 29, 2021, W.T. transferred another $155,000 to Aksarben Evolution Bank Account #7412 to complete her investment. KUBLER used W.T.'s funds to repay other investors. For example:

      a.     On or about April 30, 2021, KUBLER transferred $129,678.40 to G.F., another Aksarben Evolution investor.

35.     On or about December 28, 2021, KUBLER and W.T. signed another agreement in which Green Saddle purchased W.T.'s purported 5% interest in Zone 5 Entertainment in exchange for future payments over 60 months.

36.     In truth and in fact, however, KUBLER designed the contract between W.T. and Green Saddle to conceal the fraud from W.T. At the time of the agreement, KUBLER knew that W.T. did not actually own any interest in Zone 5 Entertainment to sell to Green Saddle, and he knew that Green Saddle lacked sufficient assets or income to satisfy its obligations to W.T.

### *Investor G.L.*

37.     From approximately February 2019 through approximately October 2021, KUBLER solicited G.L. for investment opportunities with Aksarben Evolution and Green Saddle.

38.     G.L. told KUBLER that he wanted a safe investment for his children's college education. KUBLER misrepresented Aksarben Evolution's and Green Saddle's financial conditions to G.L. and falsely represented that both were investments in high-quality commercial real estate.

39.     From approximately February 2019 to approximately October 2021, G.L. invested approximately $200,000 in Aksarben Evolution and Green Saddle.

40.     G.L.'s money was not used to invest in real estate. Rather, KUBLER used G.L.'s funds to repay other investors, make transfers to other KUBLER entities, and to fund his personal lifestyle.

41.     For example, on or about October 5, 2021, G.L. transferred $50,000 to Green Saddle Bank Account #9417, which had a balance of $80.00 before the deposit, representing G.L.'s investment in Green Saddle. The majority of the funds were then transferred to Kubler Financial and to KUBLER individually, specifically:

      a.     On or about October 5, 2021 through on or about October 6, 2021, KUBLER transferred $45,000 to Kubler Financial Bank Account #3072 and $3,000 to KUBLER's personal bank account, KUBLER Bank Account #4334.

42.     On or about December 7, 2022, KUBLER solicited G.L. to invest an additional $15,000 in a real estate investment trust ("REIT") in which G.L. had previously invested. KUBLER provided transfer instructions and wiring instructions to G.L. KUBLER had written or caused to be written on the transfer instructions that D.M. was to transfer 625 shares of common stock in the REIT to G.L. in exchange for $15,000. The wiring instructions directed G.L. to wire $15,000 to a

7

bank account under KUBLER's control in the name of Company 1. In truth and in fact, however, D.M. did not know of or intend to sell any common stock in the REIT to G.L.

43.     On or about December 8, 2022, G.L. wired $15,000 to Company 1's bank account pursuant to the instructions provided by KUBLER. In truth and in fact, however, and contrary to KUBLER's representations to G.L., G.L. did not obtain any ownership interest in the REIT through the transaction.

## COUNT ONE
### (Securities Fraud)

44.     Paragraphs 1 through 43 of this Bill of Indictment are re-alleged and incorporated by reference as though fully set forth herein.

45.     From in or about December 2017 through at least April 2023, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### JON PATRICK KUBLER

and others known and unknown to the Grand Jury, willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon investors and others, in connection with the sale of securities, to wit: the investments in various common enterprises offered by KUBLER and his businesses, as set forth above.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5.

## COUNT TWO
### (Transactional Money Laundering)

46.     Paragraphs 1 through 43 of this Bill of Indictment are re-alleged and incorporated by reference as though fully set forth herein.

47.     On or about January 11, 2022, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### JON PATRICK KUBLER

did knowingly engage, attempt to engage, and caused others to engage, in the following monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is the deposit, withdrawal, transfer and exchange described below of United States currency, funds, and monetary instruments in the

8

amount specified below, such property having been derived from a specified unlawful activity, to wit, securities fraud as alleged in Count 1:

An electronic transfer, in the amount of $30,475, drawn on Green Saddle Bank Account #9415 made payable to KUBLER FINANCIAL INC.

All in violation of Title 18, United States Code, Section 1957(a).

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. §§ 982 and 28 U.S.C. § 2461(c). Under § 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The following property so subject to forfeiture in accordance with sections 982 and/or 2461(c):

    a.      All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment;

    b.      All property involved in the transactional money laundering violations; and

    c.      If, as set forth in 21 U.S.C. § 853(p), any property described in (a) and (b) cannot be located upon the exercise of due diligence, has been transferred or sold do, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant to the extent of the value of the property described in (a) and (b).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds set forth above: a forfeiture money judgment in the amount of at least $4,161,919.24, such amount representing the proceeds of the securities fraud scheme set forth herein.


A TRUE BILL


FOREPERSON


RUSS FERGUSON
UNITED STATES ATTORNEY


_____
ERIC A. FRICK
SPECIAL ASSISTANT UNITED STATES ATTORNEY


_____
GRAHAM R. BILLINGS
ASSISTANT UNITED STATES ATTORNEY


10